UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

CIVIL ACTION NO. 1:15cv00656-WOB

JOHN DUNCAN                                              PLAINTIFF

VS.                     <u>MEMORANDUM OPINION AND ORDER</u>

GENERAL ELECTRIC, INT'L                                  DEFENDANT


        This is an employment discrimination action. Plaintiff
alleges that defendant terminated his employment on the basis of
his disability in violation of the Americans with Disabilities Act
and Ohio law.

        This matter is before the Court on defendant's motion for
summary judgment (Doc. 26). The Court previously heard oral
argument on this motion and took the matter under advisement.
(Doc. 61).

        After further study, the Court now issues the following
Memorandum Opinion and Order.

### Factual and Procedural Background

        General Electric Engine Services ("GE") employed John Duncan
for approximately thirty-three years. At all relevant times,
plaintiff worked in the Aircraft Components Service Center
("ACSC") in Cincinnati, Ohio.

        Also at relevant times, Courtney Kasselman was the general
manager of the plant,(Doc. 28-1, pg. 23), Brandon Pung was the

operational manager, (Doc. 22-1, pg. 22), Adam Schoenling was the human resource manager, (Doc. 23-1, pg. 19), Keith Alexander was the logistic/cell leader and Duncan's direct supervisor, (Doc. 28-1, pg. 24), and Alexa Hadfield was the human resource representative, (Doc. 21-1, pg. 10).

### A. Traumatic Events in Plaintiff's Personal Life

Beginning in 2007, a series of traumatic events occurred in plaintiff's personal life.  First, plaintiff learned that his father — who lived in another state — had died three and a half months prior.  (Doc. 25-1, pg. 129, 138).  This news caused plaintiff to become depressed.  (Doc. 25-1, pg. 137-8).

Sometime in 2009 or 2010, plaintiff's son told his parents that he was gay. (Doc. 25, pg. 268); (Doc. 38, pg. 6).  Plaintiff withdrew from his son and they did not talk for a period of time. (*Id.*).  In addition, plaintiff's son drank too much, was expelled from Ball State, and was generally having problems with the family. (Doc. 25-1, pg. 114-5).

As a result of these problems, plaintiff's demeanor and conduct at work began to change. (Doc. 38-3, par. 6).  His friend and co-worker, James Hurst, testified that plaintiff's voice became louder, and he would speak very quickly and ask the same questions repeatedly.  (*Id.*).

In mid-2010 through mid-2011, plaintiff took Short-Term Disability (STD) leave and was hospitalized for mental health

issues.[1]  (Doc. 25-1, pg. 114, 148).  Plaintiff was diagnosed as bipolar and manic depressive during these visits. (Doc. 25-1, pg. 148).  Plaintiff was prescribed a myriad of medications to treat his mental health issues.  (Doc. 38-1, par. 4); (Doc. 38, pg. 6).  Plaintiff returned to work in May 2011 after his medications were adjusted.  (Doc. 38-1, par. 5).  However, employees at the ACSC knew that plaintiff had been out for psychiatric reasons and some expressed concerns that he might be dangerous. (Doc. 38-3, par. 8).

Around Christmas 2013, plaintiff's son told the family he had been diagnosed with HIV.  (Doc. 25-1, pg. 268-269).  This caused plaintiff to withdraw further from his son, who was using drugs, not taking his HIV medicine, stealing medications from his sister, and lying to his family. (Doc. 25-1, 269).  These problems exacerbated plaintiff's emotional problems.  (Doc. 38, pg. 6).

On May 1, 2014, plaintiff's son committed suicide with one of plaintiff's shotguns. (Doc. 38, pg. 7).  Plaintiff endured viewing the scene and helping to clean it up.  (Doc. 25-1, pg. 181, 303-4).  However, plaintiff tried not to take time off and returned to work shortly after his son's death. (Doc. 38, pg. 7).

Plaintiff soon began to exhibit erratic behavior at work: throwing hard-boiled eggs at people, pouring iced tea on someone,

---

[1] It is unclear whether it was one continuous leave or a series of STD leaves. (Doc. 38-1, par. 4); (Doc. 38-3, par. 6).

sneaking up and poking people, and placing chip bags on someone's head. (Doc. 38, pg. 8); (Doc. 28-1, pg. 35-6); (Doc. 21-1, pg. 33-40). Plaintiff's conduct and strange comments led Alexander, Pung, and Hadfield to fear that plaintiff might be suicidal. (*Id.*); (Doc. 28-1, pg. 34-5).

In late June 2014, Pung instructed Alexander to talk to plaintiff about his conduct. (Doc. 22-1, pg. 75-6); (Doc. 25-1, pg. 151-2); (Doc. 28-1, pg. 41); (Doc. 38, pg. 9). Alexander was worried about plaintiff's well-being and his ability to cope, as it was having an effect on plaintiff's behavior and work. (Doc. 28-1, pg. 41). As a result of this meeting, plaintiff was referred to the Employee Assistance Program (EAP) and placed on STD.[2] *Id.*

Plaintiff was in in-patient treatment from the end of June until July 8, 2014. (Doc. 25-1, pg. 155). He was admitted for a "decompensating manic state and stress over the recent committed suicide of [his son] []." (Doc. 25-1, pg. 156). Plaintiff's mental state manifested symptoms of "worsening anxiety, racing thoughts and mind unable to focus, distracted, poor frustration tolerance, increasing irritability, not sleeping for days and manic rages continued, acting interfering (*sic*) in his self-care and activity on a day-to-day basis." (Doc. 25-1, pg. 156-7).

---

[2] It is disputed whether plaintiff was placed in EAP or plaintiff approached EAP. Either way, Duncan left on STD. *Id.*

While admitted, plaintiff displayed erratic and manic behaviors indicative of mental illness. (Doc. 25-1, pg. 159-62). Plaintiff was discharged on July 8, 2014, after his doctor altered his medication. (Doc. 25-1, pg. 165).

On July 11, 2014, plaintiff was admitted to the emergency room, with directions for him to be admitted to another health center. (*Id.*). Plaintiff's family admitted him because he was rolling on the ground uncontrollably, *id.*, and there were concerns about the safety of his wife and daughter. (Doc. 38-1, par. 8). After again altering his medications, the hospital released plaintiff on July 18, 2014. (Doc. 25-1, pg. 172-4). Plaintiff's wife moved out of their home in August 2014, and initiated divorce proceedings. (Doc. 38-1, par. 12).

On September 19, 2014, plaintiff requested to return to work. (Doc. 29-1, pg. 75). However, per GE policy, plaintiff needed a signed release from his treating physician authorizing him to return to work. (Doc. 29-1, pg. 56-7). GE sought a release from plaintiff's physician; however, a nurse practitioner signed the release. (Doc. 25-1, pg. 206). For unknown reasons, GE was unable to get a signature from plaintiff's treating physician.[3] *Id.*

---

[3] Plaintiff testified that he never saw his treating physician, Dr. Bakhtier, to be cleared to work, because he never went back to see him. (Doc. 25-1, pg. 212).

Because his physician could not be contacted, plaintiff was referred to a GE EAP psychologist, Dr. Zucker. (Doc. 25-1, pg. 206; Doc. 60 at 67). Dr. Zucker wrote a report authorizing plaintiff to return to work. (Doc. 50, pg. 52-3). Finally, plaintiff was directed to meet with Dr. Linz, a GE doctor, on October 27, 2014. Dr. Linz approved an accommodation allowing plaintiff to switch to first shift. (Doc. 30-1, pg. 50).

## B. Plaintiff's Conduct and GE's Investigation

Plaintiff returned to work on October 27, 2014, after his appointment with Dr. Linz. (Doc. 38, pg. 11).[4]

On November 19, less than a month after plaintiff's return to work, Hadfield received reports that plaintiff was making inappropriate and offensive remarks of ethnic, racial, and/or vulgar sexual nature. (Doc. 21-1, pg. 70-3). In response, GE initiated an investigation.

Hadfield first interviewed Matt Powers, who brought the issue to GE's attention. (Doc. 21-1, pg. 67-9). Powers informed Hadfield of inappropriate comments that plaintiff made to other employees. (Doc. 21-1, pg. 70-1). On the same day, Hadfield also interviewed Tim Knox, Kraig Smith, and "Madison."[5] (Doc. 21-1, pg. 75).

---

[4] Plaintiff's divorce became final on November 7, 2014, which he testified was very upsetting to him. (Doc. 25-1, pg. 227-28).

[5] Madison's last name is not in the record.

During Knox's interview, Knox alleged that plaintiff had urinated in the work area. (Doc. 21-1, pg. 76-7). Additionally, Knox alleged that plaintiff had made sexual comments about the cleaning lady, Madison, and Andrea Simon, another employee. (Doc. 21-1, pg. 78-9).

During Smith's interview, Smith re-affirmed the comments made by Knox. (Doc. 21-1, pg. 78-9). Additionally, Smith stated that "[plaintiff] talks about sex all of the time, very graphic, and then he gives [] example[s]." (Doc. 21-1, pg. 82).

During Madison's interview, Madison stated that "[plaintiff] is an odd guy and has made inappropriate comments, but nothing that has made me feel uncomfortable, and nothing directed towards me." (Doc. 21-1, pg. 85-6). However, she could not recall any specific inappropriate comments. (Doc. 21-1, pg. 86).

After these interviews, Hadfield met with Pung and Alexander. (Doc. 21-1, pg. 89). Together they decided that Alexander would interview plaintiff the next day. *Id.*

On November 20, 2014, Alexander met with plaintiff. (Doc. 28-1, pg. 64; Doc, 25-1, pg. 24-26). Alexander read plaintiff a document which outlined the allegations against him. (Doc. 28-1, pg. 67-70). Plaintiff initially denied making any of the comments, but he then stated that he may have made some of the comments. (*Id.*, Doc. 25-1, pg. 24-26). He admitted to making several vulgar statements regarding various sexual acts, including oral sex.

(*Id.*). He denied urinating in the work area. Plaintiff then started crying, talking about his son and father and his divorce. He described feeling anxious and having nightmares; he stated he woke up at 3:00 a.m. and sat in the cold and listened to the coyotes; and he said that "he didn't want to die but when God takes him he takes him." (Doc. 28-1, pg. 73-74). Plaintiff also stated that he had not intended to offend anyone. (*Id.*).

After Alexander interviewed plaintiff, Pung conducted interviews with the same people as Hadfield.[6] (Doc. 21-1, pg. 76).

Later in the day, Pung interviewed Ron Crutchleo, a co-worker of plaintiff. (Doc 22-1, pg. 124). During this interview, Crutchleo said that plaintiff "is ready to blow." (*Id.*). Crutchleo then said that, earlier in the day, plaintiff had made threats towards two of the people who had been interviewed the day before and the he stated, "I will kill a fucking rat." (Doc. 22-1, pg. 125). Pung relayed this information to Alexander and Hadfield. (Doc. 22-1, pg. 132).

Alexander brought plaintiff to Pung's office. (DO. 28-1, pg. 83). Pung, Alexander, and Thomas concluded the meeting by

---

[6] The information obtained during the separate interviews was recorded and typed on the same document. (Doc. 21-1, pg. 75).

suspending plaintiff with pay, pending the outcome of further investigation.[7] (Doc. 28-1, pg. 85).

Pung then conducted more interviews. He re-interviewed Smith and Knox regarding the alleged comments that plaintiff had threatened to "kill rats." (Doc. 22-1, pg. 143-7). Kraig stated that he had seen plaintiff "amped up" talking to Knox and saying that "nobody ratted on people back then" and that if "there were rats back then they would be told to them to get the fuck out of there." (Doc. 22-1, pg. 143).

Additionally, on November 21, 2014, Pung re-interviewed Crutchleo, who affirmed that he had heard plaintiff state that he was going to "kill them fucking rats." (Doc. 31-1, pg. 131-33).

On November 24, 2014, Pung and Alexander interviewed plaintiff by phone. (Doc. 28-1, pg. 89). Pung told plaintiff that an allegation had been made against him that he had called some co-workers rats and that he said he would kill the rats. (Doc. 25-1, pg. 231). Plaintiff stated that he had never threatened anyone or made racially insensitive comments. (Doc. 25-1, pg. 230). Plaintiff also stated that he had come back to work too soon, that he had an appointment with his psychiatrist

---

[7] It is contested whether the interviewers confronted plaintiff with the specific allegations regarding the reported threats or whether they simply sent plaintiff home. (Doc. 28-1, pg. 91). It is not disputed, however, that plaintiff was informed he was suspended pending an investigation.

that evening, and that he did not want to hurt anyone. (Doc. 28-1, pg. 94); (Doc. 22-1, pg. 184-5). Because plaintiff stated that he had not threatened anyone, Pung asked plaintiff whether he had called anyone a rat, and plaintiff denied making such a statement. (Doc. 22-1, pg. 192-3).

After this call, Pung and Schoenling met to discuss the investigation.[8] (Doc. 22-1, pg. 196-7). They collected the information from Alexander and Hadfield and made a recommendation to Kasselman.[9] (Doc. 23-1, pg. 264-5). Kasselman made the final decision to terminate plaintiff's employment. (*Id.*).

GE informed plaintiff of his termination through a letter and telephone call on December 1, 2014. (Doc. 22.1, pg. 196); (Doc. 23-1, pg. 267). The letter stated, in pertinent part:

> As a result of multiple reports of inappropriate actions and comments made by you in the workplace, an investigation was conducted. It was verified through this investigation that there were multiple occasions where you made comments of a violent, sexual and racist nature that were witnessed by other employees. These actions are in direct violation of our company code of conduct, and as such, your employment with the General Electric Company has been terminated effective today, December 1, 2014.

(Doc. 60 at 73).

---

[8] The discussion occurred over a series of meetings, which spanned several days. (Doc. 22-1, pg. 197).

[9] Kasselman was the highest ranking person at the plant and had the ultimate authority to make the final decision on whether to terminate plaintiff's employment. (Doc. 23-1, pg. 269-70).

## C. **This Lawsuit**

Plaintiff filed this lawsuit on October 6, 2015, alleging violations of the Americans with Disabilities Act and relevant Ohio law. (Doc. 1, amended by Doc. 12).

### *Analysis*

In order to state a prima facie case of disability discrimination under the ADA and Ohio law, Plaintiff must show that he (1) is disabled, (2) is otherwise qualified for the position, with or without reasonable accommodation, (3) suffered an adverse employment action, (4) the employer knew or had reason to know of the Plaintiff's disability, and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced. *See Ferrari v. Ford Motor Co.,* 826 F.3d 885, 891-2 (6th Cir. 2016) (citing *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996)).

If the prima facie case is established, the burden shifts to defendant to "offer a legitimate explanation for its actions." *Id.* Once the employer does so, the burden then shifts back to plaintiff who "must introduce evidence showing that the proffered explanation is pretextual." *Id.*

## A. **Plaintiff's Prima Facie Case**

The test to determine disability is: (1) whether a physical/mental condition is an impairment, (2) identify the life activity relied upon and whether it is a major life activity, and

(3) whether that impairment has been substantially limited the major life activity. *Bragdon v. Abbott,* 524 U.S. 624, 630-31 (1998). A disability can be either physical or mental. 42 U.S.C. § 12102(1)(A).[10] A mental impairment includes "[a]ny mental or psychological disorder, such as . . . emotional or mental illness." 29 C.F.R. § 1630.2(h)(2). A disability is considered at the time of an adverse employment action. *Swanson v. Univ. of Cincinnati,* 268 F.3d 307, 315 (6th Cir. 2001).

Here, the record shows that Plaintiff was having serious mental health problems. (Doc. 12, pg. 3). Plaintiff was diagnosed with bipolar manic depression and at times was committed to a psychiatric hospital. (Doc. 25-1, pg. 144, 150, 163). Plaintiff had difficulties focusing at work. (Doc. 28-1). Thus, plaintiff has shown that he suffered from a disability at the time his employment was terminated. Defendant does not contest this point.

Defendant argues, however, that it did not know that Plaintiff had a disability.

"[U]nless the [employer] knew or believed that the plaintiff was disabled, or knew that the symptoms were caused by a disability as defined by law, it would be impossible for the [employer] to have made its decision *because* of the disability." *Yarberry v. Gregg Appliance, Inc.*, 625 F. App'x 729, 737 (6th Cir. 2015).

---

[10] Under Ohio Law, the definition for a disability is similar. R.C. § 4112.01(13).

However, an employer need not know about the specifics of the condition if "symptoms were severe enough to alert [the employer of the] disabling condition." *Nilles v. Givaudan Flavors Corp.,* 521 F. App'x 364, 369 (6th Cir. 2013).

Here, Plaintiff suffered from a mental illness, bipolar manic depression. (Doc. 25-1, pg. 148). Mental illness is not a visible condition, such as age, therefore where the condition is "invisible" it cannot be inferred that the employer knew of the disability. *Nilles v. Givaudan Flavors Corp.,* No. 1:10-cv-919, 2012 WL 1537613, at *5 (S.D. Ohio March 29, 2012), *aff'd* 521 F. App'x 364 (6th Cir. 2013). However, "it may be that some symptoms are so obviously manifestations of an underlying disability that it would be reasonable to infer that an employer actually knew of the disability." *Yarberry,* 625 F. App'x at 737 (quoting *Hedberg v. Ind. Bell Tel. Co.,* 47 F.3d 928, 934 (7th Cir. 1995)).

Courts use a fact-intensive inquiry to determine whether the employer had knowledge of the disability. In *Yarberry,* the employee had a sudden onset of extreme symptoms followed by hospitalization. *Yarberry,* 625 F. App'x at 738. The employee's manifestation of the mental illness were strange text messages and emails; inability to carry on rational conversation; a clean drug test; and placement in a psychiatric hospital. *Id.*

Similarly, in *Taylor,* plaintiff became psychotic at work, her employer knew of her hospitalization, and the school district was

in contact with the hospital. *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296 (3rd Cir. 1999).

In contrast, in *Principal,* an employee was bipolar and his condition was impacting his work performance. *Taylor v. Principal Fin. Group, Inc.,* 93 F.3d 155, 159 (5th Cir. 1996). The employee later told the employer of the condition but stated that he would be "alright." *Id.* Similarly, in *Crandall,* an employee who displayed rude behavior did not reveal to his employer that he suffered from bipolar disorder. *Crandall v. Paralyzed Veterans of America,* 146 F.3d 894, 896-7 (D.C. Cir. 1998).

Here, after Plaintiff's son's death, Plaintiff displayed erratic behavior. This drew the attention of the HR department and management. Employees reported plaintiff's erratic behavior and a possible risk of suicide. Aware of these issues, management encouraged Plaintiff to take short-term disability leave. (Doc. 28-1, pg. 41). Plaintiff was on leave for four months, from the end of June until the end of October 2014. When Plaintiff returned to work, within a month he caused an accident by crashing a crane, (Doc. 28-1, pg. 55), was investigated again for erratic behavior, (Doc. 21-1, pg. 70-3), and required an accommodation before he could return to work.[11] (Doc. 30-1, pg. 64-5).

---

[11] The Sixth Circuit has held, "an employer cannot be said to know or have reason to know of an employee's disability where that employee returns to work without restriction or request for accommodation. The natural assumption in such a case is that the employee is fully fit for

Based on the totality of the circumstances, and construing the evidence in plaintiff's favor, the Court concludes that a reasonable jury could find that defendant knew of plaintiff's disability at the time it terminated his employment.

**B.** **Defendant's Legitimate, Non-Discriminatory Reason**

Once plaintiff establishes a prima facie case of disability discrimination, the burden shifts to Defendant to proffer a legitimate, nondiscriminatory reason for its conduct. *Ferrari,* 826 F.3d at 892.

Defendant has articulated a legitimate, nondiscriminatory reason for its actions: its conclusion that plaintiff made inappropriate conducts and then threatened to kill the co-workers who reported those comments. (Doc. 22-1, pg. 201-202); (Doc. 23-1, pg. 264-5).

It is clear that death threats constitute a legitimate nondiscriminatory reason for termination. *Smith v. Leggett Wire Co.,* 220 F.3d 752, 759 (6th Cir. 2000). "Employers . . . must be permitted to take appropriate action with respect to an employee on account of egregious or criminal conduct, regardless of whether the employee is disabled." *Maddox v. Univ. of Tenn.*, 62 F.3d 843,

---

work." *Leeds v. Potter,* 249 F. App'x 442, 449 (6th Cir. 2007) (quoting *Hubbs v. Textron, Inc.,* No. 99-1292, 2000 WL 1032996, at *2 (6th Cir. 2000)). Here, the record reflects that an accommodation was made by moving plaintiff to an earlier shift. (Doc. 30-1, pg. 50).

847 (6th Cir. 1995) (*abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012)).

Although plaintiff denied making the threats to kill the employees he allegedly deemed "rats," defendant asserts that it had an honest belief in its reason for discharging plaintiff. *See Majewski v. Automatic Data Processing, Inc.,* 274 F.3d 1106, 1117 (6th Cir. 2001). Under the "honest belief" rule, an "employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Id.* (internal quotations and citation omitted). An employer establishes an "honest belief" if the employer "reasonably relied on the particularized facts that were before it at the time the decision was made." *Id.* The rule does not require "the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Smith v. Chrysler Corp.,* 155 F.3d 799, 807 (6th Cir. 1998) (citation omitted).

Here, defendant's investigation laid the foundation for an informed decision. The investigation was triggered by an employee who reported offensive comments made by plaintiff. (Doc. 21-1, pg. 68-9). The investigation continued with four more employee interviews. (Doc. 21-1, pg. 75); (Doc. 28-1, pg. 77-80). After gathering information, Hadfield, Pung, and Alexander confronted

16

plaintiff with the allegations. (Doc. 28-1, pg. 64). Plaintiff eventually admitted some of the allegations and denied others. *Id.*

Pung then conducted more interviews, which led to the interview of Crutchleo. (Doc. 22-1, pg. 124). It was Crutchleo who informed Pung of death threats made by Plaintiff against the "rats."[12] *Id.* Pung and the other interviewers had no reason to distrust information from Crutchleo. (Doc. 22-1, pg. 43-4); (Doc. 28-1, pg. 106); (Doc. 23-1, pg. 268-9). Plaintiff was then sent home, with pay, pending further investigation. (Doc. 28-1, pg. 83). Ultimately, Kasselman made the decision to terminate plaintiff's employment based on all the information that had been gathered.

The honest belief rule requires analyzing the facts as they were "at the time the decision was made." *Majewski,* 274 F.3d at 1117. While plaintiff argues that defendant's investigation was flawed, he does not assert what information could have been discovered to disprove the reports of his co-workers regarding the alleged threats. Additionally, the employer does not need to conduct an investigation that "left no stone unturned." *Smith*, 155 F.3d at 807; *see also Seeger v. Cincinnati Bell Tel. Co.,* 681 F.3d 274, 286 (6th Cir. 2012) (affirming summary judgment

---

[12] Plaintiff conceded to not liking "rats," as "[m]ost of the blue-collar employees resented them. (Doc. 38, pg. 31).

notwithstanding the contention that the employer ignored evidence and failed to seek clarifications).

In sum, plaintiff has adduced no evidence that defendant did not have an honest belief that plaintiff had engaged in the conduct alleged, and defendant has thus stated a legitimate non-discriminatory reason for its action. The burden shifts to plaintiff to raise a triable issue of pretext.

**C. Plaintiff's Burden to Show Pretext**

"To overcome this honest belief and demonstrate pretext, the plaintiff must produce sufficient evidence from which the jury could reasonably reject this explanation and instead infer that the defendant intentionally discriminated against him." *Block v. Meharry Med. Coll.,* 723 F. App'x 273, 280 (6th Cir. 2018) (citation omitted); *see also St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515 (1993) (stating that "a reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason.").

A plaintiff can demonstrate pretext by showing that the employer's reason (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action. *Block,* 723 F. App'x at 281.

Plaintiff argues pretext in three ways: (1) the investigation was severely flawed, (2) similarly situated employees were treated

differently, and (3) alleged shifting reasons for Plaintiff's termination.

### 1. "Similarly Situated" Employees

Plaintiff relies on allegations regarding a myriad of different incidents that occurred around the plant over a span of years. Plaintiff identifies ten allegedly similarly situated employees: (1) Tom Barham; (2) Martin Gerdes; (3) Martin Gerdes, again; (4) John Thomas; (5) Dexter Watkins; (6) Greg Casteel; (7) Michael Ash; (8) Ron Crutchleo; and (9) two unnamed employees. (Doc. 38, pg. 39-47).

The similarly situated analysis does not require an "exact correlation," rather the comparator must be similar to the plaintiff in "all of the *relevant* aspects." *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir. 1998) (citation omitted). In the disciplinary context:

> [T]he individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*Id.* (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). "However, the weight to be given to each factor can vary depending upon the particular case. . . In other words, context matters and exact correlation is not required." *Gosbin v.*

*Jefferson Cty. Comm'rs,* 725 F. App'x 377, 384 (6th Cir. 2018) (internal quotations and citations omitted).

The same supervisor factor "is made on a case-by-case basis and does not depend entirely on whether the two shared the same immediate supervisor. *Barry v. Noble Metal Processing, Inc.,* 276 F. App'x 477, 481 (6th Cir. 2008) (citations omitted).[13] Rather, "in many instances the term supervisor should be construed broadly to include cases where both employees' situations were handled by the same ultimate decision-maker." *Barry v. Noble Processing, Inc.,* 276 F. App'x 477, 481 (6th Cir. 2008) (internal quotations and citations omitted).

The same conduct factor requires that the conduct "must be similar in kind and severity." *Barry,* 276 F. App'x at 483 (citing *Clayton v. Meijer, Inc.,* 281 F.3d 605, 610-1 (6th Cir. 2002)).

### a. <u>Plaintiff's Conduct</u>

Plaintiff was investigated for allegedly making ethnic, racial, and/or sexual remarks to more than one employee. The investigators then confronted plaintiff with the allegations. During another interview the next day, an employee informed Pung

---

[13] To the extent that Plaintiff argues a similarly situated employee does not need to have the same supervisor because of the holding in *Louzon,* the issue in that case was whether certain information was discoverable, not whether it sufficed to raise a triable issue at the summary judgment stage. *Louzon v. Ford Motor Co.,* 718 F.3d 556, 567 (6th Cir. 2013).

that Plaintiff made death threats against the co-workers who had reported his inappropriate remarks.

The individuals involved in the investigation of plaintiff's conduct and his subsequent termination started working at the GE plant sometime after 2013: Alexander, Plaintiff's direct supervisor, transferred to the plant in spring 2014; Hadfield, the HR representative, began at GE in June 2014; Pung, the operational manager, began in spring 2013; Schoenling, the HR manager, started in July 2013; and Kasselman, the plant general manager who made the determination to terminate Plaintiff's employment, started in July 2013.

### b. **Tom Barham**

Plaintiff identifies Tom Barham as a similarly situated employee.[14]

Sometime between 2004 and 2005, Barham was employed at GE under supervisor Chris Cunningham. Barham was having an argument with another co-worker, where he stated "[w]hat if I told you I had a gun in my truck?" Barham was then escorted out of the building. Before his termination, Barham was given the chance to receive anger-management counseling.

---

[14] Both affidavits recount "rumors" or information heard from another employee. (Doc. 38-2, par. 11); (Doc. 38-8, par. 14-5).

Barham is not a similarly situated employee with respect to plaintiff. First, hearsay evidence offered in an affidavit — where information is not made on personal knowledge — is considered "wholly insufficient evidence to establish a claim of discrimination as a matter of law." *Mitchell,* 964 F.2d at 584-5.

Second, the event occurred around 2004, before any of the relevant supervisors or managers were employed. Otherwise comparable employees cannot be similarly situated where they were disciplined by different decisionmakers. *Barry,* 276 F. App'x at 481 (citing *Smith v. Leggett Wire Co.,* 220 F.3d 752, 762-3 (6th Cir. 2000)).[15]

Finally, Barham's conduct was not similar, as he was terminated after making a reference to having a gun in his truck. While a such a statement is completely out of line, it is not of comparable seriousness to a direct threat to kill co-worker. Therefore, there are differentiating and mitigating factors which

---

[15] In *Gibson*, the Sixth Circuit explained that the "same supervisor" is not required to establish a similarity. *Gibson v. Shelly Co.,* 314 F. App'x 760, 771 (6th Cir. 2008). *Gibson* is distinguishable because the supervisor there was required to consult a "Safety Committee" before making disciplinary decisions. *Id.* Here, Plaintiff's conduct was investigated by his supervisor and management, and termination was ultimately confirmed by the general manager of the plant. Additionally, each individual involved in the process were employed well after the time of this incident. Thus, in *Gibson* a "same supervisor" may not be relevant where a safety committee makes a termination decision. Here, "same supervisor" is a relevant factor because the decision was made by Plaintiff's supervisors and recommended to the ultimate decisionmaker.

distinguish the alleged comparator's conduct and the employer's response thereto. *Ercegovich*, 154 F.3d at 352.

### c. <u>Martin Gerdes, Part One</u>

Plaintiff identified Martin Gerdes as a similarly situated employee. Sometime in the late 2000s, while Gerdes was employed at GE, Gerdes made a threat to a co-worker that he would bring a gun. Gerdes was terminated. However, he invoked the right to a peer-review as provided in the employee handbook. The peer-review process allowed Gerdes to be reinstated.

Gerdes is not similarly situated to plaintiff. First, for the same reason as Barham, the events occurred somewhere in the late 2000s. This was before the relevant individuals involved in plaintiff's termination process were employed.

Second, Gerdes is distinguishable from Plaintiff because Gerdes was subject to a different standard. Gerdes was terminated and was subsequently reinstated through the peer review process. This is an important distinction because the peer-review process gave Gerdes leniency, not his supervisors. Therefore, Gerdes is not similarly situated.

### d. <u>Martin Gerdes, Part Two</u>

Plaintiff identified Gerdes as a similarly situated employee for additional conduct. Gerdes was known to bite co-workers while on the job. Despite his supervisor's awareness of the issue, no actions were taken against Gerdes.

Here, the conduct cannot be considered of "comparable seriousness." Even though an "exact correlation" need not be present, Gerdes's alleged conduct is not akin to the seriousness of a direct death threat against a co-worker. *Ercegovich,* 154 F.3d at 352; *see also Smith*, 220 F.3d at 763 ("horseplaying" which resulted in a pair of heated pliers being stuck on a coworker's neck was deemed "significantly less threatening" than a death threat to "blow away some MFers."). Therefore, Gerdes' conduct cannot be considered to be of "comparable seriousness."

### e. John Thomas

Plaintiff identified John Thomas as a similarly situated employee. Thomas was employed as a supervisor at another plant and was involved in a heated argument with another manager. Thomas followed the other manager home with the intent of "whipping his ass," however, the police were called to the scene. Thomas was not fired for his conduct, nevertheless, he was transferred to another GE location.

Thomas is not a similarly situated employee with respect to plaintiff. First, similar to Gerdes, Thomas was not comparable as to the same supervisor or same standard, because at the time of the incident he was employed at a separate facility. Therefore, Thomas would not have had the same supervisor, nor would he be subject to the same ultimate decisionmaker. *Barry,* 276 F. App'x

at 481 (citing *McMillan v. Castro,* 405 F.3d 405, 414 (6th Cir. 2005)).

Second, they are not similarly situated where Thomas was a supervisor, and Plaintiff was an hourly employee. *Mumaw v. Dollar Gen. Corp.,* 19 F. Supp. 2d 786, 791 (S.D. Ohio 1998); *see also Hatchett v. Health Care and Retirement Corp. of America,* 186 F. App'x 543, 548 (6th Cir. 2006) ("Differences in job title, responsibilities, experience, and work record can be used to determine whether two employees are similarly situated.") (citation omitted).

Finally, Thomas' conduct was not of "comparable seriousness" as to Plaintiff's conduct. Thomas never threatened to kill, only to "beat [someone] up." *Smith,* 220 F.3d at 762-3 (a threat to fight was "significantly less threatening conduct than a threat to kill). Therefore, Thomas and plaintiff are not similarly situated.

### f. Dexter Watkins

Plaintiff next identified Dexter Watkins as a similarly situated employee. Sometime while employed at GE, Watkins he threatened to "beat up" an HR representative. During the investigation, Watkins freely admitted to the threat, but stated that he would not have actually fought the other employee.

Watkins is not a similarly situated. Like Thomas, Watkins never threatened to kill anyone, only to beat-up another co-worker. Because a threat to fight is not comparable and does not rise to

a level of "comparable seriousness" as to Plaintiff, Watkins is not similarly situated. *Smith,* 220 F.3d at 763.

### g. Greg Casteel

Plaintiff also identified Greg Casteel as a comparator. While Casteel was employed at GE, he was involved in arguments which escalated to threats of fighting. Plaintiff points to three incidents. First, Casteel became agitated and attempted to provoke John Thomas into a fight. Second, Casteel had a "violent confrontation" with the plant manager. Finally, Pung disciplined Casteel for losing his temper and blowing up on another co-worker.

Casteel is not a similarly situated employee with respect to plaintiff. First, similar to Barham, the first two incidences were not reviewed by the same supervisor or decisionmaker. *Barry,* 276 F. App'x at 481. Second, the incident with plant manager is unsupported by the record.[16]

---

[16] The testimony by Casteel did not reference any violent altercation with the plant manager, Mr. Clapsaddle. The only reference to the plant manager was to show that he was in the office when Casteel was being disciplined by Thomas: "but he proceeded that they said they should fire me right not and the other John said no, there is (sic) two sides to every story and that's basically what happened." (Doc. 24-1, pg. 17). While the testimony stated Clapsaddle was in the room, it was not offered to state there was a "violent altercation." *Id.* There were no other references to Clapsaddle in the testimony. Therefore, the incident with Clapsaddle is unsubstantiated by the record and will not be considered. Fed. R. Civ. P. 56; *see also Hall v. Sky Chefs, Inc.,* 784 F. Supp. 2d 811, n. 11 (E.D. Mich. 2011).

Third, similar to Thomas, a threat to fight is not the same as a threat to kill. Therefore, Casteel's conduct is not of "comparable seriousness." And, to the extent that plaintiff argues that Casteel was a habitual offender, his combined threats to fight co-workers are not comparable to a direct threat against a co-worker's life. *See, e.g. Quinn-Hunt v. Bennett Enters., Inc.,* 211 F. App'x 452, 458 (6th Cir. 2008) (multiple minor punctuality issues of co-worker not similar to plaintiff's excessive tardiness of more than one hour on multiple occasions with addition to other offenses).

### h. **Michael Ash**

Plaintiff identifies Michael Ash as a similarly situated employee. Sometime between 2003 and 2004, when Ash was employed at GE, an employee reported Ash to human resources. Two coworkers, Dexter Watkins and Doug Cope, told Mike Meadows that Ash "may come after him and shoot him." Meadows reported the information to human resources and the only action taken was to reassign Ash to a different location.

Again, Ash is not similarly situated. As with Barham, this incident before any of the relevant managers or supervisors were employed at GE. *Barry,* 276 F. App'x at 481.

Second, Ash's conduct was not similar. Meadows was warned that "Ash had issues" with him and "may shoot him." Here, an employee approached Pung during the investigation into plaintiff's

conduct, informed him that plaintiff was "ready to blow," and that he had made threats to "kill a fucking rat." During the investigation, the same employee affirmed plaintiff's threats and stated it was "common knowledge" that plaintiff was referring to two of the co-workers who had reported his misconduct.

These two incidents are not of "comparable seriousness," because, based on the totality of the circumstances, they are not "similar in kind and severity." *Clayton,* 281 F.3d at 611. *See id.* at 610 (truck drivers who violated the same safety policy were not similarly situated because their conduct did not result in serious harm).

### i. Ron Crutchleo

Plaintiff identifies Ron Crutchleo as a comparator. Sometime while working at GE, Crutchleo allegedly informed Meadows that he tried to run Alexander, the HR manager, over with his truck in the parking lot. However, according to Meadows, nothing happened to Crutchleo "as far as [he knew]."

Crutchleo is not a similarly situated employee with respect to plaintiff. First, this evidence is inadmissible hearsay offered in an affidavit. *Mitchell,* 694 F.2d at 584-5. Where Mike Meadows testified that he did not know if any discipline occurred as a result of Crutchleo's conduct, the testimony raises no triable

issue.[17]  Furthermore, plaintiff concedes that both Crutchleo and Alexander deny the incident took place.

### j. Workplace Fight

Finally, Plaintiff refers to an incident involving two unidentified employees as an example of similarly situated employees.  John Trump stated that he "witnessed a fist fight between two employees on the ACSC production floor" and that they were not terminated.  (Doc. 38-7 ¶ 10).

This two-sentence paragraph in Trump's affidavit raises no triable issue of fact.  Plaintiff has failed to adduce any information regarding the identity of these employees; whether management was aware of the fight; when the incident occurred; or any other information to place the alleged incident in context.

---

[17] Plaintiff argues that although the statement is hearsay, the statement falls within an exception. Plaintiff asserts the statement is admissible pursuant to Rule 804(b)(3), statement against interest.  Additionally, Plaintiff asserts that Crutchleo is an "adverse party."  Defendant argues that in order for Rule 804 (b)(3) to allow Crutchleo's statements to be admissible, Crutchleo must be unavailable pursuant Rule 804(a).

In order to Rule 804 to apply, the declarant is required to be "unavailable" as a witness.  Fed. R. Evid. 804(a).  Here, Plaintiff admits that Crutchleo, the declarant, denies that the incident occurred.   Under Rule 804(a)(3), a declarant is unavailable if they "testify to not remembering the subject matter."  However, "a denial does not constitute a lack of memory pursuant to Rule 804(a)(3)." *Williams v. United Dairy Farmers,* 188 F.R.D. 266, 273 (S.D. Ohio, 1999) (during a deposition, when plaintiff was asked whether he made the alleged statements, the plaintiff denied making such statements).  Thus, Crutchleo would not be considered "unavailable" and the hearsay exception under Rule 804(b)(3) is inapplicable.

Second, similar to Barham, a fight is not comparable to a death threat against a co-worker. Therefore, even if more facts were alleged to verify the identities or reasons behind the fight, the conduct would not be of "comparable seriousness."

Thus, even when viewed in light most favorable to plaintiff, there is no genuine dispute as to any of the alleged comparators, and plaintiff has failed to demonstrate pretext on this theory.

### 2. "Shifting Reasons

This leaves plaintiff's third argument, which is that defendant gave "shifting reasons" for terminating plaintiff's employment. The only evidence that plaintiff cites in this respect is a document from the Ohio Department of Job and Family Services awarding him unemployment benefits. (Doc. 60 at 75). The document states that plaintiff was fired "for stirring up resentment and/or dissatisfaction among other employees." (*Id.*).

However, this document was not created by defendant, and there is no evidence of who the source of that information was, which would leave the Court to speculate as to its source. In fact, the statement could be simply what plaintiff told the unemployment agency.

In short, defendant's reasons for firing plaintiff have been consistently stated and plaintiff thus has failed to raise a triable issue as to pretext.

**D.  Conclusion**

In sum, the Court concludes that plaintiff has raised no triable issue on his claims for disability discrimination, and defendant is entitled to summary judgment.


Therefore, having reviewed this matter, and being sufficiently advised,

**IT IS ORDERED** that defendant's motion for summary judgment (Doc. 26) be, and is hereby, **GRANTED**.  A separate judgment shall enter concurrently herewith.

This 20th day of September, 2018.



Signed By:

*William O. Bertelsman*  WOB

**United States District Judge**